UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 11-24599-CV-COOKE/TURNOFF

In re: the Application of Chevron Corporation,

      Petitioner,

To Issue Subpoenas for the Taking of
Depositions and the Production of Documents.
_____/

## ORDER AND RECOMMENDATION

**THIS CAUSE** is before the Court upon the Application of Chevron Corporation ("Chevron") for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery from Banco Pichincha, C.A. Miami Agency ("Banco Miami[1]") for Use in Foreign Proceedings **[DE1, 4]**, and a prior Order of Referral entered by the Honorable Marcia G. Cooke. **[DE16]**. Also pending are Chevron's Motion for Leave to File Digital Video Discs **[DE57]**, and Chevron's Motion to Strike the Declarations of the Lago Agrio Plaintiffs' Ecuadorean Lawyers Sanz and Fajardo **[DE62, 63]**. A hearing on this matter took place before the undersigned on Friday, May 4, 2012.

Upon review of the Application, the related Motions, the Responses, the Replies, the declarations, the proposed subpoena, the court file, the applicable law, hearing argument from counsel, and being otherwise duly advised in the premises, the undersigned makes the following findings.

## Background

The long and sordid  history of the "Lago Agrio" litigation has been well documented in

---

[1]"Banco Miami" shall be used to refer to the "Miami Agency" or branch of Banco Pichincha, C.A. "Banco Ecuador" shall be used to refer to Banco Pichincha, C.A. which maintains its corporate headquarters in the Republic of Ecuador. "The bank" shall be used as a general reference to the bank as an entity.

countless federal court opinions. See e.g. Chevron Corp. v Berlinger, 629 F.3d 297, 300 (2d Cir. 2011); Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 387 (2d Cir. 2011); In re Chevron Corp., 650 F.3d 276, 279 (3d Cir. 2011); In re Chevron Corp., 633 F.3d 153, 155 (3d Cir. 2011); Aguinda v. Texaco, Inc., 303 F.3d 470, 473 (2d Cir. 2002);   Jota v. Texaco, Inc., 157 F.3d 153, 155 (2d Cir. 1998). Indeed, the events surrounding this litigation have been referred to as "the most extensively told in the history of the American federal judiciary." Chevron Corp. v. Naranjo, 667 F.3d 232, 234 (2d Cir. 2011). In light of same, this Report shall *attempt* to provide only the necessary background.[2]

In the early 1990's, residents of Ecuador's Oriente region filed suit against Texaco, claiming that oil exploration and extraction activities by its subsidiary, Texaco Petroleum ("TexPet"), and Petroecuador,[3] caused massive environmental devastation. Aguinda v. Texaco, Inc., 945 F. Supp. 625, 626-27 (S.D.N.Y. 1996), aff'd, 303 F.3d 470, 485 (2d Cir. 2002).   Chevron inherited this litigation when it merged with Texaco in 2001. In re Chevron Corp., 633 F.3d at 156.   Initially, two separate actions were filed in the United States.   One group of plaintiffs filed their suit  in Texas state court. That case was eventually removed to a federal court in the Southern District of Texas. Sequihua v. Texaco, Inc., 847 F. Supp. 61, 62 (S.D. Tex. 1994)(dismissed on grounds of forum *non-conveniens* and comity).   A second group of plaintiffs filed suit in the Southern District of New York. Aguinda, 945 F. Supp. at 625 (dismissed on grounds of *forum non-conveniens* and comity[4] after brief discovery).

---

[2]The background provided was complied from various pleadings, declarations, exhibits, as well as related court opinions from other districts.

[3]Petroecuador is the Republic of Ecuador's state-owned oil company.

[4]The Aguinda court noted that the dismissal was also due to failure to join indispensable parties, i.e., Petroecuador and the Republic of Ecuador. Aguinda, 945 F. Supp. at 627-628.

*Settlements*

In 1995, prior to the dismissal of <u>Aguinda</u>, TexPet entered into a settlement with the Republic of Ecuador ("ROE") and Petroecuador. <u>Berlinger</u>, 629 F.3d 297, 301 (2d Cir. 2011). Pursuant to the settlement, TexPet agreed to perform environmental remediation in exchange for a release of claims by the ROE.   <u>In re Application of Chevron Corp.</u>, 709 F. Supp. 2d 283, 286 (S.D.N.Y. 2010). The release covered TexPet, Texaco and other related entities.  It included only "environmental impact" claims.[5]  A few years later, the ROE released TexPet and its related companies from "any liability and claims." <u>Id.</u>   The settlements were finalized in 1998.  Chevron spent over $40 million on the remediation. <u>Naranjo</u>, 667 F.3d at 235. To this day, Chevron and ROE continue to litigate the validity of the settlements. <u>Id.</u> at 236.

*Lago Agrio Litigation*

Sometime in 2003, after the <u>Aguinda</u> dismissal, and notwithstanding the ROE settlement, a group of Ecuadorian residents ("Lago Agrio plaintiffs" or "LAPs[6]") filed suit against Chevron in Lago Agrio, Ecuador ("Lago Agrio litigation").     The Lago Agrio litigation has been plagued with allegations of corruption and fraud, on both sides, since its inception.   At the outset, the court ordered that a "global assessment" of damages be conducted by a team of experts. <u>Berlinger</u>, 629 F.3d at 302. Chevron claims that the presiding judge, under pressure from the LAPs,  eventually agreed to replace the independent experts with a single Ecuadorian "global expert." **[DE4]**.  Emails by and between lead

---

[5] The contractual obligations were excluded from the release.  Those obligations would be released later, as the remedial work was performed and approved to the satisfaction of ROE and Petroecuador. <u>In re Application of  Chevron Corp.</u>, 709 F. Supp. 2d at 286.

[6] The LAPs include most of the same individuals that brought the <u>Aguinda</u> action. <u>Republic of Ecuador v. Chevron Corp.</u>, 638 F.3d 384, 390  n.5 (2d Cir. 2011).

LAP attorneys, Steven Donziger and Joseph Kohn memorialize these events. Id.   In one particular email, Donziger discusses the need to vet and hand pick an individual who would, as Chevron puts it, "[act] as a shill" for the LAPs and the ROE, and reach favorable conclusions as to causation, liability and damages." Id.; see also Neuman Decl. **[DE6, Ex. 14-17]**.      This expert, as described by Donziger would have to "totally play ball with [them] and let [them] take the lead while projecting the image that he is working for the court." Neuman Decl. **[DE6, Ex. 17]**.      They found their man in "Richard Stalin Cabrera Vega" ("Cabrera").   According to Chevron, Cabrera was bribed by LAP attorneys and consultants, with payments from secret accounts at Banco Pichincha. **[DE6, Ex. 7]**.   It is alleged that the LAP attorneys and/or consultants later ghostwrote Cabrera's $ 27.3 Billion damages assessment.   **[DE 4]**.      This anecdote represents a mere snapshot of the many salient events that transpired during the Lago Agrio litigation.

Since then, Chevron has obtained mounds of evidence, in multiple § 1782 proceedings, that suggests that the judgment itself was also ghostwritten. **[DE4]**.   For example, a forensic document analysis conducted on the judgment revealed that it contains verbatim passages that were taken from various pieces of the LAP lawyers' internal, unfiled, work product.   Id.; see also, Report of Robert A. Leonard, Ph.D (June 27, 2011).   **[DE6-6, Ex. 42]**(finding that the Lago Agrio court decision was plagiarized in whole or in part from the LAPS unfiled work product).   A Maryland district court reviewing this evidence specifically noted that the LAPs representatives' unpublished work product appeared to have been incorporated into the Ecuadorian court's decision, in some instances, "[on] a virtual line-by-line "[7] basis. **[DE6-14, Ex. C]**; Hr'g Tran. 10:16-25-11:12 (Aug. 31, 2011); Chevron

---

[7]Demonstrative slides were presented during the May 4, 2012 proceedings before the undersigned to show the overlapping in the language taken from the Ecuadorian judgment and internal memoranda from the LAPs' attorneys.  A line by line comparison clearly reveals

Corp. v. Page, No. 8:11-cv-01942- RWT[8]( D.Md. Aug. 31, 2011).

*Crude*

The elaborate conspiracy described above, and the planning related thereto, was memorialized in a documentary film created by producer and film maker, Joseph Berlinger. Chevron Corp. v. Berlinger, 629 F. 3d 297, 300 (2d Cir. 2011). Donziger approached Berlinger in 2005, and asked him to create the film in order to tell "his clients' story." Id. Berlinger shadowed the plaintiffs' lawyers for a few years, filming the people and events surrounding the litigation. Over six hundred hours of raw footage was generated. Id. at 303. The result, a documentary titled, *Crude: The Real Price of Oil* was released in 2009. Id. Chevron discovered the footage and shortly thereafter, the fraud began to unfold.

*Related § 1782 Applications*

Chevron began making numerous § 1782 requests, eventually gaining access to, among other things, the *Crude* outtakes and Donziger's litigation files. In re Chevron Corp., 63 F. 3d 153, 156 (3d Cir. 2011). Chevron was able to convince the courts that the attorney client privilege never attached to the files, because the information was gathered as part of a journalistic investigation. Berlinger, 629 F. 3d at 306. Unedited *Crude* outtakes revealed, among other things, Donziger's negative view of the Ecuadorian judiciary; the LAPs' litigation, legislative and political strategies; and how the LAPs planned to use any resulting Ecuadorian judgment to force a quick settlement with Chevron. Naranjo, 667 F.3d at 237. Also uncovered was a memo titled "Invictus," which details proposed enforcement strategies, including using simultaneous enforcement efforts in multiple jurisdictions as settlement leverage. Id. Again, these are mere highlights and snippets of the events surrounding the Lago Agrio

---

significant overlapping. **[DE 75-76].**

[8]These related proceedings involved a similar § 1782 Application.

litigation.

Chevron presented this, and other evidence, to the Lago Agrio court alleging fraud. Id. Nevertheless, on February 14, 2011, the court issued a judgment against Chevron in the amount of $18.2 billion. Chevron appealed the judgment. Same was affirmed by an intermediate court. Naranjo, 667 F.3d 232, 237 ( 2d. Cir. Jan. 26, 2012).    That affirmance paved the way for Chevron's appeal to a higher court, i.e., the National Court of Justice, similar to our Supreme Court.   Id.; see also, **[DE 73]**; Hr'g Tran. 33:18-25; 34:1-5 (May 4, 2012).

*Declaratory Action in New York*

Around this same time, Chevron filed a declaratory action in the Southern District of New York. The named Defendants in that action were the LAPs and Donziger.   Chevron v. Donziger, 768 F. Supp. 2d 581, 597 (S.D.N.Y. 2001).   The action was filed, in part, under New York's Uniform Foreign Country Money-Judgments Recognition Act[9] ("the Recognition Act"), N.Y. C.P.L.R. 5301-5309(McKinney 1970). Id. Chevron, as a potential judgment-debtor, sought a global anti-enforcement injunction against the LAPs and Donziger prohibiting them from attempting to enforce the judgment. The district court granted the injunction, and an appeal to the Second Circuit followed.   Donziger, 768 F. Supp. 2d at 581.   Thereafter, the Second Circuit vacated the injunction and stayed the district court proceedings pending the  appeal.   Chevron Corp. v. Naranjo, No. 11-1150-cv, 2011 U.S. App. WL 4375022 * 1 (2d Cir. Sept. 19, 2011).   On appeal, the Second Circuit found that district court erred in construing the Recognition Act to grant putative judgment-debtors a cause of action to challenge foreign judgments before enforcement is sought.   Naranjo, 667 F. 3d at 234 (judgment-debtors, like Chevron,

---

[9]The Recognition Act allows judgment creditors to enforce foreign judgments in New York courts, subject to certain exceptions.

can only challenge the validity of a foreign judgment defensively – in response to an attempted enforcement).

*BIT Treaty Arbitration*

On September 23, 2009, a few years before the Ecuadorian judgment was entered, Chevron filed an international arbitration claim against the ROE in the Permanent Court of Arbitration in The Hague.  The action was filed pursuant to the United States -Ecuador Bilateral Investment Treaty (hereinafter "BIT"). **[DE4]**; see also,  Treaty Between The United States of America and The Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investments, U.S. - Ecuador, Aug. 27, 1993, S. Treaty Doc. No. 103-15 (1997).  BIT proceedings are, as a general matter, designed to settle investment disputes between foreign investors and the host government.  Republic of Ecuador, 638 F.3d at 392 (citing BIT, art. VI). In this connection, the proceedings are limited to the resolution of disputes

> between a Party [to the BIT] and a national[10] or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or ( c) an alleged breach of any right conferred or created by [the BIT] with respect to an investment.

BIT, *supra* art. VI. § 1.

In the BIT proceedings, Chevron argues, among other things, that the ROE  colluded with the LAPs in order to " impose a grossly improper 'damage' award against Chevron, and to shift the government's own environmental liability." **[DE4]**.    Chevron also argues that the ROE abused the criminal justice system in the prosecution of its lawyers Rodrigo Perez Pallares and Richard Reis

---

[10]The BIT defines a "national" as "a natural person who is a national of a Party [to the BIT] under its applicable law." *supra* BIT, art. I § 1( c).

Veiga.[11]

The ROE filed suit against Chevron in New York in an attempt to stay the BIT proceedings. The ROE was unsuccessful and the proceedings continued. Republic of Ecuador, 638 F. 3d at 384.

On February 16, 2012, the BIT tribunal issued an Interim Award ordering the ROE,

> [T]o take all measures necessary to suspend or cause to be suspended the enforcement and recognition within and without Ecuador of the judgments by the Provincial Court of Sucumbíos, Sole Division (*Corte Provincial de Justicia de Sucumbios, Sala Unica de la Corte Provincial de Justicia de Sucumbios*) of 3 January 2012 and of 13 January 2012 (and, to the extent confirmed by the said judgments, of the judgment by Judge Nicolas Zambrano Lozada of 14 February 2011) against the First Claimant in the Ecuadorean legal proceedings known as "the Lago Agrio Case.

[DE40, Ex. A, ¶ 3(I)].

On February 27, 2012, the tribunal issued another Interim Award rejecting all of the ROE's objections and finding that the tribunal had the requisite jurisdiction to consider the merits of Chevron and TexPet's treaty claims against the ROE. [DE43, Ex. A, ¶5.2]. The Ecuadorian intermediate court has acknowledged that, as an arm of the ROE, it is bound by the Treaty. However, it has refused to follow the BIT tribunal's orders. [DE73], Hr'g Tr.33:1-25 (May 4, 2012). As noted above, Chevron has appealed this matter to the National Court of Justice, ROE's equivalent to our Supreme Court. Id. Upon information and belief, that appeal remains pending.

*Discovery Requested*

In the Application at hand, Chevron seeks leave to conduct discovery from Banco Miami, for use in both the Lago Agrio litigation and in the BIT arbitration proceedings. [DE4,5]. The specific

---

[11]Pallares and Veiga were charged – in Ecuador – with falsifying public documents in connection with the underlying settlement and releases. It has been suggested that these lawyers were targeted in order to "nullify or undermine the value of" the settlement and releases. In re Application of Chevron Corp., 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010).

relief requested is leave to issue a subpoena directed to Banco Miami. Id.  The proposed subpoena is attached as "Exhibit A" to the Application, and for present purposes is incorporated by reference in this Report. **[DE5-1]**.  The subpoena contains two (2) enumerated requests.  No. 1 requests "ALL DOCUMENTS" pertaining to the following eight (8) specific Banco Pichincha accounts:

| Account Holder | Ending Numbers |
|---|---|
| Amazon Defense Front (4) | 4298-00, 9048, 0404-04 and 8794 |
| Luis Yanza Angamarca, [12] | 1000 |
| Jorge Enrique Jurado Mosquera,[13] | 1986 |
| CESAQ-PUCE Laboratory[14] | 5304 |
| Selva Viva Selviva Cia Ltda. a/k/a Selva Viva or Selva Cia, Ltda. | 4450-04 |

No. 1 includes subparts (a)-(k).[15]  These subparts list  examples of documents that Chevron considers responsive. Id.  No. 2 contains subparts (a)-(rr) and seeks "ALL DOCUMENTS associated with Currency Transaction Reports and Suspicious Activity Reports concerning any of the following individual or entities."  Id.  Subparts (a)-(rr) list over forty-four (44) individuals and/or entities. Id.  Chevron contends that the requested documents will enable it to "determine the amount and timing of [the bribe] payments, and how they were used to procure the fraudulent judgment." **[DE4, n.8]**.

---

[12]Ecuadorian counsel to the LAPs, and a leader/member of the Amazon Defense Front. **[DE 4, n. 8]**.

[13]A court appointed "neutral" expert. Id.

[14]A laboratory used by the LAPs to test water and soil samples. Id.

[15]Subpart(k) contains subparts (a) -(xliv). **[DE 5-1]**.

Initially, when questioned by the Court about the many components of the subpoena, Chevron's counsel indicated that the various subparts in the (2) two requests pertain to the same eight (8) accounts discussed *supra*.   Counsel initially explained that the broad list was simply meant to demonstrate the kinds of documents that they are looking for.   Specifically, counsel stated,

> MS. NEUMAN:
>
> Then to try and make sure that the search for the document is thorough and we get the discovery that we are entitled to, we say, "Such documents would include the following," and we list bank statements or accounts, cancelled checks; you know the types of documents we want them to look for, and then we say, "All other documentation not specifically requested herein that relate to the account numbers," the same account numbers, "and any of the following individuals or entities.
>
> So, to the extent that we know people who were involved in the case and appeared likely to have been receiving or putting funds into these accounts, we listed them, but it is under the umbrella of we would like all of the documents related to these 8 accounts.   It is not a separate request.

[DE 73], Hr'g Tr. 66:7-19, May 4, 2012.

*   *   *

|  |  |
|---|---|
| THE COURT: | How many accounts were there? Accounts? |
| MS. NEUMAN: | 8 |
| THE COURT: | 8? |
| MS. NEUMAN: | That's it. |
| THE COURT: | Okay.  And you want all documents relating to those 8 accounts, right? |
| MS. NEUMAN: | Yes. |

Id. at 66: 20-25; 67:1.

Later in the proceedings, however, counsel clarified that No. 2 is actually a separate request, and that it *may not* specifically relate to the accounts listed in No. 1.   Rather, No. 2 seeks "suspicious

activity reports which . . . are designed to catch payments that are likely to be used in illicit activity."

**[DE 73]**, Hr'g Tr. 71: 13-16. The enumerated sub parts list the names of persons known to Chevron

to be involved in the fraudulent scheme – including the LAPs, their Ecuadorean counsel and their

known consultants. Id. at 71:18-19. A line-by-line comparison of the names listed in both Nos. 1 and

2 reveal that they are identical.

## Legal Standard

In considering a § 1782 Application, a court must first determine whether it has jurisdiction

to consider same.  28 U.S.C. § 1782(a)  states in pertinent part,

> (a) The district court in which a person resides or is found may order him to give his testimony
> or statement or to produce a document or other thing for use in a proceeding in a foreign or
> international tribunal, including criminal investigations conducted before formal accusation.
> The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or
> international tribunal or upon the application of any interested person and may direct that the
> testimony or statement be given, or the document or other thing be produced, before a person
> appointed by the court....To the extent that the order does not prescribe otherwise, the testimony
> or statement shall be taken, and the document or other thing produced, in accordance with the
> Federal Rules of Civil Procedure.

28 U.S.C. § 1782 (a).

In this connection, the burden is on the party opposing the discovery. In re Chevron Corp.,

633 F.3d 153, 163 (3d Cir. 2011). If a court determines that the requirements of §1782 are met, it must

then determine whether the requested discovery complies with the Federal Rules.  For example, if the

subpoena at issue is directed to a party that resides or is found in the district, same must comply with

Fed.R.Civ.P. 45. In re Application of Inversiones y Gasolinera Petroleos Vanezuela, S. De R.L., No.

08-20378-MC, 2011 WL 181311, at * 6 (S.D. Fla. Jan. 9, 2011).  Assuming that the above requirements

are met, a federal district court is authorized, but is not required, to provide assistance to a complainant

in foreign proceedings.  Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 242 (2004).

Once the *prima facie* elements of § 1782 are satisfied, the following discretionary factors, as set forth by the United States Supreme Court in <u>Intel</u>, should be considered: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, or court or agency abroad, to US federal-court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is otherwise intrusive or burdensome. <u>Id.</u> at 244.

District courts must exercise their discretion with an eye towards the twin aims of the statute, to wit: "providing efficient means of assistance to participants in international litigation and encouraging foreign countries by example to provide similar means of assistance to our courts." <u>In re Metallgesellschaft</u>, 121 F.3d 77, 79 (2d Cir. 1997). These considerations counsel heavily in favor of generous federal court assistance. <u>In re Application of Edelman</u>, 295 F.3d 171, 180 (2d Cir. 2002).

<u>**Analysis**</u>

As noted above, Banco Miami opposes Chevron's Application. The LAPs, or intervenors, have also submitted papers in opposition. **[DE55]**. Both opposing positions, together with Chevron's arguments, shall be addressed below.

*LAPS*

At the outset, it is important to note that the LAPs are neither parties to the BIT arbitration, nor are they the targets of the proposed subpoena. They are participating in these proceedings solely as intervenors. **[DE 47]**.

In their opposition papers, the LAPs argue that the BIT proceedings do not constitute "foreign

proceedings[16]" under § 1782. **[DE55]**.  They argue, *inter alia*,  that the discovery requested is irrelevant

to what they call a "private investment arbitration."  Id.  During oral argument, the LAPs' counsel

expressed concern that Chevron's  true objectives are:  (1) to interfere with the judgment the LAPs

obtained in Ecuador; and (2) to use the requested discovery against the LAPs in the New York litigation.

For these reasons, they urge the Court to deny the Application.

     These arguments fail to persuade.

     As correctly noted by Chevron, this  issue, i.e., whether the BIT proceedings constitute foreign

proceedings for purposes of §1782, has been previously argued and ruled upon in other litigation.  In

fact, similar §1782 requests – related to the instant BIT proceedings – have been successful  in other

districts.   For example, in In re Chevron Corp., 753 F.Supp. 2d 536, 537-38 (D. Md. 2010), Chevron

filed a §1782 Application seeking discovery from two LAP's experts, Daniel Rourke  and Carlos

Picone.  Id.  There, the requested discovery, like here, was meant to be used in both the Lago Agrio

litigation and the BIT arbitration. Id.  The Court granted the application and found that "international

arbitral bodies [like the BIT] operating under UNCITRAL[17] rules constitute 'foreign tribunals' for

purposes of §1782."  Id. at 539 (explaining that "because arbitral bodies are created by treaty and not

by private parties, they do in fact constitute "foreign tribunals for purposes of [1782].""). There appears

to be significant agreement at the district court level in this connection.  Republic of Ecuador v.

Bjorkman, 801 F. Supp. 2d 1121, 1124  n.1 (D.C. Colo. 2011);  In re Veiga, 746 F.Supp.2d 8, 23

(D.D.C. 2010)(finding that the BIT Arbitration falls within the "metes and bounds" of § 1782(a));  In

---

    [16]It is worth noting that Banco Miami, the actual target of the subpoena, is not challenging
the foreign nature of the BIT proceedings. **[DE23]**.

    [17]United Nations Commission on International Trade Law.

re Republic of Ecuador, No. 1:10-mc-00040 GSA, 2010 WL 4027740 at * 1-2 (E.D.Cal. Oct. 14, 2010)(allowing the issuance of a § 1782 subpoena – for use in the BIT proceedings – related to videotaped bribe offers directed to the presiding judge in the Lago Agrio litigation); In re Application of Chevron Corp., 709 F. Supp.2d 283, 291 (S.D.N.Y. 2010)(finding that the BIT proceedings were foreign in nature, because the arbitral tribunal was established by an international treaty).   The undersigned finds no binding authority that compels this Court to reach a contrary finding.

The LAPs' argument as to relevance likewise warrants very little discussion.  First, given the within allegations, the evidence submitted, and the record herein, it can hardly be said that the requested discovery is irrelevant to either proceeding.  For present purposes, the applicant need only show that the information sought has "some relevance" as a general matter.  Republic of Ecuador, 2010 WL 402770, at *4.  In fact, the court need not, nor should it, determine whether the discovery would actually, or even probably, be admissible in the foreign proceedings.  See In re Bayer AG, 146 F.3d 188, 193 (3rd Cir 1998).

As noted above, the LAPs also argue that Chevron is misusing § 1782, and that its real goal is to use the discovery in the New York litigation.  **[DE55]**.  That contention, even if true, does not change the analysis herein.  The instant proceedings are limited to the Application at hand.  They do not extend to either the New York litigation or any other litigation between the LAPs and Chevron in any other part of the world.   Without making any such findings, the undersigned notes that in the event that Chevron attempts to use any discovery obtained in a manner not consistent with the statute, the LAPs shall have their remedy in the appropriate jurisdiction.   In either event, those matters are not ripe for judicial determination at this time.

Consistent with the above, it is **RESPECTFULLY RECOMMENDED** that the LAPs'

objection to the relief requested be **DENIED**.

Having dispensed with the LAPS' objections, the Court shall address Chevron's Application and Banco Miami's opposition thereto.  Here, Chevron argues that it has met all of the requirements of § 1782, and that the discretionary factors espoused by Intel weigh heavily in its favor.  Banco Miami, on the other hand, opposes the Motion, but concedes the following: (1) that it is located in this district; (2) that the Application seeks the production of documents; (3) that the Application seeks evidence for use in a proceeding before a foreign[18] or international tribunal; and (4) that Chevron is an interested person. **[DE23]**.

By way of summary, Banco Miami argues that Chevron's Application should be denied, because it asks this Court to violate the laws of the ROE.  Banco Miami also contends that § 1782 does not extend to documents located outside of the United States, and that the proposed subpoena does not comply with Rule 45.[19]  Further, in its view, the Intel factors mandate denial of the application. Alternatively, Banco Miami suggests that if the court is not inclined to deny the Application, it should at least enter a stay to permit the foreign jurisdiction to decide these issues. Id.  Each argument shall be addressed in turn.

First, Banco Miami argues that it has already produced the documents within its possession, custody or control, and that any/all other responsive documents are located in Ecuador and are not in its control.  Because of this, among other things, it argues that the proposed subpoena fails to comply

---

[18]Banco Miami, however, does not agree that the current status of the foreign proceedings at issue, i.e., the BIT Arbitration, warrants the granting of the Application.

[19]Typically, once a court determines that the requirements of §1782 are met, it must then determine whether the requested discovery complies with the Federal Rules– namely, Rule 45. For present purposes, and given the combined nature of Banco Miami's arguments, Rule 45 shall be addressed together with the statutory requirements.

with Rule 45.  Along these same lines, Banco Miami argues that its mere presence, as an agent in this district, does not require the enforcement of a subpoena seeking production of documents that are located outside of the United States. **[DE23]**.   According to Banco Miami, it does not control documents in the custody of Banco Pichincha, C.A.'s ("Banco Ecuador") corporate headquarters in Ecuador.    In this connection,  Banco Miami submits the Declaration of Evan Acosta, its General Manager.  **[DE23-1]** Acosta Decl. ¶ 4-6.   Acosta states that the bank's principal office is located in Quito, Ecuador, and that the bank has many branches throughout the ROE. Id. Acosta describes Banco Miami as not a branch, but rather, the bank's international banking agency licensed under the laws of the State of Florida. Id. at ¶ 7.  According to Acosta,

> On the basis of their statutory and regulatory authority, Banking Regulators have established a supervisory policy requiring the international banking agencies of foreign banks in the United States to function as separate/stand-alone banking operations from their foreign bank. This supervisory policy is borne out of the Banking Regulators' legal obligation to ensure that international banking agencies in the United States operate in a safe and sound banking manner.

Id. at ¶ 10.

Acosta further declares that  "[Banco Miami] operates separately and independently from the Bank, maintaining its own separate capital accounts, books and records, general ledgers and other financial records, electronic systems, as well as its own separate customer base and customer account records from those of the foreign bank." Id.  at ¶13.   He also indicates that with the exception of one, none of the accounts listed on the subpoena correspond to Banco Miami, and that it has produced records accordingly.  Id. at ¶ 15.   Acosta maintains that any other responsive documents are not physically located in Banco Miami, and  would be kept solely under the control and possession of the bank in Ecuador. Id. at ¶ 18. The bank, says Acosta, "does not share with [Banco Miami] information

16

and documentation relating to customer accounts maintained in the Republic of Ecuador." Id. at ¶ 20. In sum, Acosta submits that there is no way that it can comply with the subpoena without violating the ROE's privacy and confidentiality laws. Id. at ¶21.

In further support of its position, Banco Miami has submitted the Declaration of Dr. Carmen Zambrano Semblantes ("Semblantes"), the bank's independent legal expert. **[DE23, Ex. B]**. According to Semblantes, neither the bank, nor its employees, may disclose to Chevron information/documentation related to its customers in response to an Order from a U.S. federal court unless same is in compliance with the pertinent laws of the ROE. **[DE 23, Ex. B]** Semblantes Decl. p. 9. In her view, if the bank and its employees were to comply with such an order, they would expose themselves to severe legal repercussions including imprisonment and hefty fines. Id. She suggests that the proper mechanism to obtain the requested discovery is by way of Letters Rogatory. Id.

Chevron, on the other hand, suggests that Banco Miami is "the bank" and that its own public filings confirm that they are, in fact, the same corporate entity. As Chevron notes, Semblantes herself admits as much. See Semblantes Decl. **[DE23, Ex. B]**("Although the Agency and the Bank may be the same legal person, both the material property and the immaterial property of said person are governed by the law of the place in which they are located."). Chevron also points out that U.S. regulations require that a bank's U.S. branches have access to the activities of its foreign operations. **[DE4]**.

Banco Miami, by its own online representations, appears to be in compliance. Specifically, it offers its U.S. customers "unrestricted access" to any funds deposited in Ecuador, as well as any account information related thereto. Because of this, Chevron suggests that the bank's corporate structure reflects co-mingling and interdependence of business transactions between its Ecuadorian headquarters and Banco Miami. The undersigned agrees.

It is somewhat disingenuous for Banco Miami to argue that the responsive documents are located in Ecuador and are inaccessible from Miami, while at the same time, representing to the public, on its website, that Banco Miami and Banco Ecuador share information.    Specifically, evidence submitted by Chevron shows that the bank's website represents that Banco Miami and Banco Ecuador share information "[F]or [their] affiliates' everyday business purposes." **[DE6-11, Ex. 75-76]**.   The bank indicates that its "affiliates" include companies bearing the names:  Banco Pichincha,  Banco Financiero or Inversora Pichincha. Id.    Further, printouts[20] from the Banco Miami's website, Banco Pichincha C.A. - Miami Agency, https://www.pichinchamiami.com/fmInfo.aspx?topic=AboutUs, explain exactly how the Bank and its affiliates share information.

For example, in its website, Banco Miami indicates that all financial companies need to share customers' personal information to run their everyday business.  It states, "In the section below, we list the reasons financial companies can share their customer's personal information; the reasons Banco Pichincha, C.A. – Miami Agency chooses to share, and whether you can limit this sharing." Id.; see also **[DE 6-11, Ex.75]**.

To illustrate,

**For our everyday business purposes** –
such as to process your transactions, maintain
your account(s), respond to court orders and legal
investigations, or report to credit bureaus.

**[DE 75-76]**; see also, **[DE 6-11, Ex.75]**.

Banco Miami itself concedes that this particular sharing for "business purposes" cannot be limited by the customer.  See Neuman Decl.  **[DE-6-11, Ex. 75]**.   In her declaration Ms. Neuman

---

[20]These printouts were presented as demonstrative evidence at the May 4th hearing before the undersigned. **[DE 6, Ex. 75] [DE75-76]**.

represents that the website printout is a true and correct copy, and that same was last accessed, by her, in November 2011. Id. A present day online search, however, reveals that this particular page is no longer accessible to the public.[21] **[DE 6, ¶ 84]**.

Consistent with the above, and upon careful review, this Court is satisfied that Banco Miami and Banco Ecuador are, for all intents and purposes, one in the same. The undersigned further finds that these entities, by their own representations, routinely share account information, not unlike what is being requested here. Simply put, the bank cannot "have its cake and eat it to." On the one hand, it represents that information is shared for business purposes, including "[responding to] court orders." **[DE 6-11, Ex. 75]**. The story changes, however, when it is actually faced with a possible court order.

The result would be the same even if the entities were completely separate and the documents were accessible only in Ecuador. This Court finds no limitation in § 1782 that prohibits the production of documents that are located abroad. In this connection, a few cases out of the Southern District of New York are instructive. For example, in In re Application of Sarrio, S.A., No. 9-372, 1995 WL 598988 at *2-3 (S.D.N.Y. Oct. 11, 1995), a district court found that the statute did not extend to discovery located abroad. Id. On appeal, however, the Second Circuit overruled the lower court on other grounds, and specifically declined to address the issue. In re Application of Sarrio, S.A., 119 F. 3d 143,143-48 (2d Cir. 1997). In so doing, the court noted *in dicta* that "there [may be] reason to think that Congress intended [1782] to reach only evidence located within the United States." Id. at 147. However, it left the matter of "whether and to what extent [the removal of the discovery] from the

---

[21]  Under the privacy policy section of their website, the page initially appears restricted or as if the content had been removed. However, if you disable the cookies the document does, in fact, come up. A pdf version of the document can also be found by typing in the website address provided in the Neuman Declaration.

United States may affect [the movant's] discovery rights" to the district court. Id. at 148, n.4.   A few years later,  another court in the same district found that "[t]here is no such express restriction in the statute, and the Court is unwilling to engraft one onto it." In re Application of Gemeinshsafts-Praxis Dr. Med. Schottdorf, 2006 WL 38444464 *5 (S.D.N.Y. Dec. 29, 2006).  The statute requires only that the party from whom discovery is sought be located in the district; not that the documents be. Id. at *5.

The reality is that "[t]he bank has voluntarily elected to do business in numerous foreign host countries... It cannot expect to avail itself of the benefits of doing business here without accepting the concomitant obligations."  In re Grand Jury Proceedings, Bank of Nova Scotia ("Nova Scotia"), 740 F.2d 817, 828 (11th Cir. 1984).  Consistent with the above, and upon review of the pleadings and the applicable law, the undersigned finds that: (1) Chevron's Application  satisfies  § 1782's requirements, (2) is in keeping with the statute's stated goals, as noted above, and (3) is in compliance with Rule 45.

*Discretionary Factors Under Intel*

As previously noted, once  the requirements of § 1782 have been satisfied, the district courts have the authority, but are not required, to entertain  discovery requests.   The court's discretionary authority is based upon the four Intel factors, to wit:

(1) *whether   the person from whom  discovery  is  sought  is  a  participant in the foreign proceeding*;

If the person from whom discovery is sought is a participant in the foreign proceedings, the need for §1782 aid is not as readily apparent. Intel, 542 U.S. at 264.  In that instance,  the foreign  tribunal would have jurisdiction over those appearing before it, and can itself order them to produce evidence. Id  Here, Banco Miami concedes that it is not a participant in the foreign proceeding.  Accordingly, this factor weighs in favor of granting the Application.

(2) *the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, or court or agency abroad, to US federal -court judicial assistance;*

As previously noted, the BIT proceedings are ongoing. The tribunal has already determined that it has jurisdiction to hear the matter. The Lago Agrio proceedings in Ecuador are likewise ongoing, as Chevron has appealed to the ROE's highest court.

Further, undersigned finds nothing in the record that suggests that either forum – the ROE or the BIT tribunal – would be unreceptive to the §1782 discovery. In fact, a simple Westlaw search reveals the multitude of § 1782 requests have been filed throughout the federal judiciary for use at the BIT arbitration and/or the Lago Agrio litigation. See e.g., In re Veiga, 746 F.Supp. 2d at 23-24. The ROE itself is the applicant in many of these actions. See e.g., Republic of Ecuador v. Bjorkman, 801 F.Supp.2d 1121 (D.Colo. 2011); In re the Application of the Republic of Ecuador, 2011 WL 736868 at * 4 (N.D. Cal. Feb. 22, 2011); In re Republic of Ecuador, 2010 WL 4027740, at * 1 (E.D. Cal. Oct. 14, 2010); In re the Republic of Ecuador, No. C 11-80171 CRB, C 11-80172 CRB, 2011 WL 4434816 at * 1 (N.D. Cal. Sept. 23, 2011).

Because the ROE has availed itself of this discovery tool, it can hardly be said that its own courts would be unreceptive to such discovery. There is likewise no evidence that suggests that the BIT arbitration panel would be non-receptive to the discovery. In fact, the record shows the exact opposite. The BIT tribunal based its findings and interim award, at least in part, on evidence that was compiled by way of § 1782 discovery. **[DE 4]**, see also **[DE 6-2, Ex.28]**, **[DE 73]** Hr'g Tr. 15:19-25, 16:1-21.

Even if opposition by the BIT tribunal did exist, that, without more, would not necessarily be dispositive. In re Chevron Corp., 709 F.Supp.2d 283, 292 n.51 (S.D.N.Y. 2010). (noting that the

European Commission involved in the seminal case of Intel, did not "need or want" U.S. federal court assistance). Consistent with the above, the undersigned finds that this factor also weights in favor of granting the Application.

> *(3) whether the request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States;*

As noted above, Banco Miami argues that Chevron is asking this Court to violate the laws of Ecuador, and that comity considerations mandate that the application be denied.   As a general matter, comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching on the laws and interest of other sovereign states.  Societe Nationale Industrielle Aerospatieale v. U.S.Dist. Court for the Southern Dist. of Iowa, 482 U.S. 522, 544 n. 27 (1987).   A comity analysis typically involves consideration of the following:   (1) The importance of the litigation or the information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine the interests of the United States, or compliance with the request would undermine the interests of the state in which the infraction is located.  Id. at n.28.  Upon careful review, the undersigned finds that  comity considerations also weigh in Chevron's favor.

With regard to the first two factors, the Court finds that the subpoena at issue is fairly specific and relatively narrow in scope.  As to the third factor, Chevron specifically suggests that the bank has not contested that the funds deposited into the accounts at issue orginated, and were being controlled from, within the United States. **[DE4]**.  Chevron bases this contention largely on statements made by Donziger in related litigation wherein he states that his work "does not let up just because [he is] in the U.S."  Chevron Corp. v. Donziger, 768 F. Supp. 2d 581 (S.D.N.Y. 2011).  In this connection, Donziger

is alleged to have: (1) intimidated the Ecuadorian judges, (2) obtained political support for the Ecuadorian lawsuit, (3) persuaded the [Government of Ecuador] to promote the interests of the Lago Agrio plaintiffs, (4) obtained favorable media coverage, (5) solicited the support of celebrities and environmental groups, (6) procured and packaged 'expert' testimony for use in Ecuador, (7) pressured Chevron to pay a large settlement, and (8) attempted to obtain a book deal. In re Chevron Corp., 749 F. Supp. 2d 141, 146 ( S.D.N.Y. 2010). Arguably, at least some of these acts, as related to the secret accounts, took place in the United States. Accordingly, this factor is, at a minimum, neutral.

As to the fourth factor, Banco Miami suggests that it has urged Chevron to, "please go down to Ecuador. Use the letters rogatory process, which is available to you, and get an order from a court in Ecuador for the documents that are there, and we will cooperate with you in Ecuador. We will not object." **[DE 73]** Hr'g Tr. 41:9-13. Chevron, on the other hand, argues that the Letters Rogatory procedures in Ecuador are impractical, especially in light of the allegations of corruption that have been raised in this litigation. **[DE30]**. Specifically, Chevron suggests that "[g]iven the corruption in Ecuador's courts, and the substance of Chevron's claims against the ROE," [the Letters Rogatory process] is not a viable option of obtaining the requested discovery. Id. Here, it appears that the bank wants to pick and chose the method and mechanism by which Chevron obtains discovery. Chevron *may*, of course, avail itself of the Letters Rogatory mechanism. However, the decision to do so lays exclusively with Chevron, not with Banco. This Court finds no authority that would *require* Chevron to initiate the Letters Rogatory process prior to, or in lieu of, going the § 1782 route. See Aerosaptiale,482 U.S. at 542 (rejecting a proposition that would mandate that a party's first resort whenever discovery is sought from a foreign litigant be the Convention procedures ).

The last, and in this Court' s view, the most significant factor, is the extent to which the

interests of either country will be undermined in the event of non compliance.  As discussed above, Banco Miami argues that compliance with the proposed subpoena would violate the ROE's banking secrecy laws.  In her Declaration, Semblantes makes references to the "right to privacy," as established by the Inter -American Convention on Human Rights, and as it relates to among other things, the "protection of honor and dignity."   **[DE 23-2, Ex. B]**.  The rights discussed by Semblantes are akin to the penumbra of rights in the U.S. Constitution.   The undersigned is not persuaded that this broad spectrum of rights  pertain to the very  narrow issues discussed herein.

The declaration does touch upon  the more relevant issues regarding the ROE's General Law on Financial System Institutions which states, "Deposits and all other resource- taking of whatever nature which take[s] place at institutions of the financial system shall be subject to banking secrecy and, therefore, the financial institutions receiving the funds and resources, their managers, officers, and employees may not provide information related to said operations except to the owner thereof or whomever legally represents him."   **[DE 23-2, Ex.B]**, Semblantes Decl. n.4 (quoting Art. 88). According to Semblantes, the laws of the ROE criminalize any violations of the right to privacy as related to information maintained in financial institutions.  The penalty for such violations can range from one to five years imprisonment. Id. (quoting Art. 94).   These laws, however, do not appear to be enforced, let alone set in stone.

The Declaration of Chevron's expert, Ana Maria de Alba ("de Alba"), suggests that  the ROE's banking laws contain no *"explicit* prohibition on compliance with foreign court order."  **[DE 31-31, Ex. 121 P.1]**, de Alba. Decl.¶ 21.   In this connection, de Alba notes, and the bank concedes,  that there are several exceptions to the banking laws.   In fact, Banco Miami concedes that,  in some instances, the laws of the ROE allow banks to produce documents pursuant to court orders.  **[DE 73]** Hr'g Tr. 41:4-

13.  Customers are also free to waive the protections of the law as to their own records. **[DE 23-2, Ex. B]**, Semblantes Decl. p.4 Art. 91.     Further, the bank's own expert recognizes that the laws have exceptions, and that waivers can be requested by:  (a) an Ecuadorian court where a lawsuit provides the grounds for the request;  (b) a prosecutor as part of an investigation; ( c) the Office of the Superintendent of Banks, where such information is sought "by the competent authorities of other States in order to fight crime," Id. at 4-6.  De Alba does concede that the noted exceptions do not *specifically* address orders by foreign courts.  However, in her view, "the production of documents by [the bank]... would [ be] consistent with these exceptions in the law, all of which are related to illicit activity." **[DE 31-31, Ex. 121 P.1]**, de Alba Decl. ¶ 23.  The undersigned agrees.

In this regard, Nova Scotia is quite instructive. Nova Scotia, 740 F.2d at 817.  There, the district court ordered the Bank of Nova Scotia to comply with a subpoena duces tecum for bank records pertaining to three (3) companies from the bank's branches in the Bahamas,[22] the Cayman Islands and Antigua.   The bank filed a motion to quash, claiming, among other things, that compliance with the subpoena would violate the secrecy laws of the Cayman Islands.   The Court denied the motion and ordered compliance forthwith.  An appeal to the 11th Circuit followed.

On appeal, the 11th Circuit found that the laws of the Cayman Islands should not be used as a blanket device to encourage or foster criminal activities. . .. Id. at 828.  Among other things, the Court found that the interests of the Cayman Islands in protecting the privacy of bank customers was diminished in light of the grand jury proceedings.  Id.  While of course the proceedings at hand do not relate to federal grand jury proceedings, the Nova Scotia case certainly serves as persuasive precedent.

---

[22]A similar motion was filed as to the Bahamian branch. However, it appears that they complied and may not have been an  integral part of the appeal.

Here, the matter pertains to a large scale fraud upon an American corporation – and a related multi-billion dollar judgment– by and between persons in the United States using funds that likely originated in the United States.  The bank, including Banco Miami, as it were, appear to be the unwilling vehicle[23] used to perpetuate these actions.    In light of this, in this Court's view, the ROE's interest   in maintaining its banking secrecy laws is, in this instance,  outweighed by the need to bring these matters to a close on the merits.

It is also worth noting that de Alba's research[24] reveals no public record or history of violation and/or enforcement of the banking laws at issue, to wit:    Chapter III of the General Law of the Institutions of the Financial System of Ecuador – Banking Secrecy and Discretion. **[DE 31-31, Ex.121 P.1]**, de Alba Decl.¶ 20(b).   Because of this, in her opinion,  it is not likely that the bank's employees or its officers would be subject to "adverse legal consequences such as the loss of their banking licensees or punishment, if they complied with such an order." Id. at ¶ 24.  She bases her opinion on her expansive knowledge of the banks in Ecuador, as well as from information obtained from the Ecuadorian Superintendency of Banks. Id. at ¶ 26; see also **[DE 31-31, "Ex. A"]**, de Alba Curriculum Vitae .

In this connection, de Alba has worked as  a risk management and banking consultant for the past 24 years.  She is the Principal at CSMB, a risk management company in the United States.  As a former senior banking official, she also focuses on financial investigations of fraud and money

---

[23]Nothing in this Report shall be construed to suggest that the bank itself was a willing participant in the Lago Agrio events.

[24]De Alba's Declaration includes information compiled by her associate, Miguel Yepez Cervantes, in Guayaquil, Ecuador.  His findings and sworn statement is attached as Exhibit "C"to de Alba's Declaration. **[DE 31-31, Ex. 121 P.1]**, de Alba Decl. ¶ 19.

laundering. Having worked at banks like SunTrust, Banco Atlántico, and International Finance Bank, she now runs risk management projects for companies like Vance International, Garda World, and Pinkerton Consulting and Investigations.   De Alba's associate, Yepez, noted in ¶ 20, likewise possesses a vast knowledge of the banking industry.  Specifically, Yepez has worked in the banking and financial sectors in Ecuador and Panama for over 20 years.  Throughout his career, he has worked at various banking institutions in positions such as, among others,  Head of Operations and Business Manager.  He also held the post of General Advisor to the UIF (the Financial Intelligence Unit) of Ecuador. **[DE 31-31, "Ex. A"]**.

According to de Alba and Yepez, the lack of civil or administrative actions imposing fines and/or sanctions based upon these banking secrecy laws confirms that enforcement is non-existent. Notably, Semblantes does not controvert this information in her Declaration.

Lastly, de Alba declares that engaging in the Letters Rogatory practice with Ecuador is impracticable, because that process may take "up to a year or more to complete." Id. at ¶ 20( c).  She bases her opinion on information received from the United States Department of State, Bureau of Consular Affairs in Washington, D.C.  Id. at ¶ 36-37.  Upon careful review and consideration, the undersigned finds that de Alba's Declaration and supporting evidence are quite persuasive.  This Court finds nothing in Chevron's application that evinces an attempt to circumvent the ROE's proof gathering restrictions,  policies or currently enforced laws.   Simply put, the bank has failed to meet its burden of persuasion.  As such, this factor likewise weighs in Chevron's favor.

*(4) whether the request is otherwise intrusive or burdensome.*

Consistent with the above, the undersigned finds no basis on which to find that the proposed subpoena is either intrusive or burdensome.  The subpoena is narrowly tailored towards obtaining

information relevant to the both the BIT arbitration and the Lago Agrio litigation. The categories of documents – specific to the eight (8) accounts enumerated above – no doubt, relate to the fraud alleged herein, and should, no doubt, be produced.

### Conclusion

In sum, this Court is satisfied that the requested information is relevant to both proceedings in light of the history of this litigation, the evidence presented, and the record herein. Accordingly and consistent with the foregoing analysis, the undersigned finds that §1782 (a) and the relevant discretionary factors weigh in favor of the issuance of the subpoena. As such, it is hereby **RECOMMENDED** that the Motion be **GRANTED**, and that Chevron be permitted to issue a subpoena for the requested records to the extent that they relate to the eight (8) specific accounts listed in same and presented to the Court *via* demonstrative slides during the May 4, 2012 hearing. Consistent with the above, Banco Miami's request for a **STAY** is **DENIED**.

With respect to the two (2) pending collateral motions, it is **FURTHER ORDERED AND ADJUDGED** that Chevron's Motion for Leave to File Digital Video Discs **[DE57]** is **GRANTED**. Chevron's Motion to Strike the Declarations of the Lago Agrio Plaintiffs' Ecuadorean Lawyers Sanz and Fajardo **[DE62,63]** is **DENIED**. The Court has considered both, the digital video discs and the declarations, in connection with this matter.

Pursuant to 28 U.S.C. § 636(b)(1)( C), the parties may file written objections to this Report and Recommendation with the Honorable Marcia G. Cooke, United States District Judge, within fourteen (14) days of receipt. Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein. RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149, reh'g denied, 7 F.3d 242 (11th Cir. 1993); LoConte v. Duggar, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S.

958, 109 S. Ct. 397 (1988).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida on this 11th day of June 2012.

_____

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:   Hon. Marcia G. Cooke
      Counsel of Record

29